JS-CAND 44 (Rev. 06/17)

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Analilia Jimenez Perea, et al.

**(b)** County of Residence of First Listed Plaintiff  Lake County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attachment

## DEFENDANTS
Diana Dooley, et al.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Gregory D. Brown, Deputy Attorney General, 455 Golden Gate Ave., Suite 11000, San Francisco, CA 94102-7004, (415) 703-5461

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| 2  U.S. Government Defendant | 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent─Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 893 Environmental Matters |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities–Employment | 535 Death Penalty | | | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| 1  Original Proceeding | ☒ 2  Removed from State Court  3  Remanded from Appellate Court  4  Reinstated or Reopened  5  Transferred from Another District *(specify)*  6  Multidistrict Litigation–Transfer  8  Multidistrict Litigation–Direct File |

## VI.  CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. section 1396a(a)(8) and (a)(30)(A) of the Medicaid Act
Brief description of cause:
The gravamen of the complaint challenges the sufficiency of CA's Medicaid reimbursement rates under federal Medicaid Act statutes.

## VII.  REQUESTED IN COMPLAINT:
✓ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:**  Yes  ☒ No

## VIII.  RELATED CASE(S), IF ANY *(See instructions)*:
JUDGE
DOCKET NUMBER

## IX.  DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*  ☒ SAN FRANCISCO/OAKLAND    SAN JOSE    EUREKA-MCKINLEYVILLE

DATE  08/11/2017      SIGNATURE OF ATTORNEY OF RECORD  /s/ Gregory D. Brown

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1) United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2) United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3) Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4) Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.

   (1) Original Proceedings. Cases originating in the United States district courts.

   (2) Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3) Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4) Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5) Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6) Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8) Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.** **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Attachment List**

| | |
|---|---|
| Thomas A. Saenz<br>Miranda Galindo<br>Mexican American Legal Defense and<br>Educational Fund<br>634 S. Spring Street, 11th Floor<br>Los Angeles, CA 90014<br>Tel. No. (213) 629-2512<br>Facsimile: (213) 629-0266<br>Email: tsaenz@maldef.org<br>     mgalindo@maldef.org | Bill Lann Lee<br>Civil Rights Education and Enforcement<br>Center<br>2120 University Avenue<br>Berkeley, CA 94704<br>Tel. No. (510) 431-8484<br>Facsimile: (303) 595-9705<br>Email: blee@creeclaw.org |
| Timothy P. Fox<br>Civil Rights Education and Enforcement<br>Center<br>104 Broadway, Suite 400<br>Denver, CO 80203<br>Tel. No. (303) 757-7901<br>Facsimile: (303) 595-9705<br>Email: tfox@creeclaw.org | Catha Worthman<br>Darin Ranahan<br>Feinberg, Jackson, Worthman & Wasow LLP<br>383 4th St., Suite 201<br>Oakland, CA 94607<br>Tel. No. (510) 269-7998<br>Facsimile: (510) 269-7994<br>Email: catha@feinbergjackson.com<br>     darin@feinbergjackson.com |
| Ana de Alba<br>Lang, Richert & Patch<br>Fig Garden Financial Center<br>5200 N. Palm Avenue, 4th Fl.<br>Fresno, CA 93704<br>Tel No. (559) 228-6700<br>Facsimile: (559) 228-6727<br>Email: ada@lrplaw.net | Noah Phillips<br>Law Offices of Noah Phillips<br>125 12th St., Suite 100 - Bali<br>Oakland, CA 94607<br>Tel No. (510) 485-8036<br>Facsimile: (510) 298-5966<br>Email: noah@noahphillips.legal |

1   XAVIER BECERRA
    Attorney General of California
2   SUSAN M. CARSON
    Supervising Deputy Attorney General
3   GREGORY D. BROWN
    Deputy Attorney General
4   State Bar No. 219209
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA 94102-7004
    Telephone: (415) 703-5461
6   Fax: (415) 703-5480
    E-mail: Gregory.Brown@doj.ca.gov
7   *Attorneys for Defendants*

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO/OAKLAND DIVISION

11

12

| | |
|---|---|
| 13   **ANALILIA JIMENEZ PEREA, SAUL JIMENEZ PEREA, ESTHER** | Case No. _____ |
| 14   **CASTAÑEDA, REBECCA BINSFELD, OFELIA JARDON, on behalf of themselves** | **NOTICE OF REMOVAL OF ACTION (28 U.S.C. § 1441(a))** |
| 15   **and a proposed class of others similarly situated; the COMMUNITY DIVISION OF** | **(FEDERAL QUESTION)** |
| 16   **THE SERVICE EMPLOYEES INTERNATIONAL UNION-UNITED** | |
| 17   **HEALTHCARE WORKERS WEST; ST. JOHN'S WELL CHILD & FAMILY** | Action Filed:  July 12, 2017 |
| 18   **CENTER; and NATIONAL DAY LABORER ORGANIZING NETWORK,** | |

19
                                              Plaintiffs,
20
            **v.**
21

22   **DIANA DOOLEY, as Secretary, California**
     **Health and Human Services Agency,**
23   **JENNIFER KENT, as Director, California**
     **Department of Health Care Services;**
24   **CALIFORNIA HEALTH AND HUMAN**
     **SERVICES AGENCY, CALIFORNIA**
25   **DEPARTMENT OF HEALTH CARE**
     **SERVICES, and DOES ONE through**
26   **TWENTY inclusive,**

27                                           Defendants.

28

1

TO THE CLERK OF THE COURT:

Please take notice that defendants Diana Dooley, in her official capacity as Secretary of the California Health and Human Services Agency; Jennifer Kent, in her official capacity as Director of the California Department of Health Care Services; the California Health and Human Services Agency (CHHS); and the California Department of Health Care Services (DHCS), hereby remove to this Court the state court action described below.

1.     On July 12, 2017, an action was commenced in the Superior Court of the State of California in and for the County of Alameda, entitled *Analilia Jimenez Perea, et al. v. Diana Dooley, et al.*, Case No. RG17867262. A true and correct copy of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (Complaint) is attached hereto as Exhibit A.

2.     The first date upon which any of the defendants received a copy of the Complaint was July 14, 2017, when defendants Kent and DHCS were served with a copy of the Complaint and a summons from the state superior court. A true and correct copy of the summons is attached hereto as Exhibit B.

3.     All defendants who have been served with the summons and Complaint join in this notice of removal, which is jointly filed on behalf of all defendants.

4.     Defendants do not waive any defenses of sovereign immunity through this removal.

**JURISDICTION**

5.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed by defendants to this Court pursuant to the provisions of 28 U.S.C. § 1441(a) in that it arises under 42 U.S.C. § 1396a(a)(8) and (a)(30)(A) of the Medicaid Act. The gravamen of the Complaint challenges the sufficiency of the State of California's Medicaid reimbursement rates under these federal Medicaid statutes.

**INTRADISTRICT ASSIGNMENT**

6.     Pursuant to Civil Local Rule 3-2(c) and (d), assignment to the San Francisco Division or Oakland Division is appropriate because the action arises in the County of Alameda.

1  Dated:  August 11, 2017                          Respectfully submitted,

2                                                   XAVIER BECERRA
                                                    Attorney General of California
3                                                   SUSAN M. CARSON
                                                    Supervising Deputy Attorney General
4

5                                                   */s/ Gregory D. Brown*

6                                                   GREGORY D. BROWN
                                                    Deputy Attorney General
7                                                   *Attorneys for Defendants*

8  SF2017203821
   12782211.doc
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# Exhibit A

1  Thomas A. Saenz (SBN 159430)
   Miranda Galindo (SBN 308499)
2  MEXICAN AMERICAN LEGAL DEFENSE
   AND EDUCATIONAL FUND
3  634 S. Spring St., 11th Fl.
   Los Angeles, CA 90815
4  Telephone: (213) 629-2512
   Facsimile: (213) 629-0266
5  Email: tsaenz@maldef.org
        mgalindo@maldef.org
6
   Bill Lann Lee (SBN 108452)
7  CIVIL RIGHTS EDUCATION AND
   ENFORCEMENT CENTER
8  2120 University Ave.
   Berkeley, CA 94704
9  Telephone: (510) 431-8484
   Facsimile: (303) 595-9705
10 Email: blee@creeclaw.org

11  *Attorneys for Plaintiffs and the Putative Class*
    *[Additional counsel appear on next page]*

12

ENDORSED
FILED
ALAMEDA COUNTY

JUL 1 2 2017

CLERK OF THE SUPERIOR COURT
By ___CURTIYAH GANTER___
                          Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13

FOR THE COUNTY OF ALAMEDA

14

|  |  |
|---|---|
| ANALILIA JIMENEZ PEREA, SAUL JIMENEZ PEREA, ESTHER CASTAÑEDA, REBECCA BINSFELD, OFELIA JARDON, *on behalf of themselves and a proposed class of others similarly situated*; the COMMUNITY DIVISION OF THE SERVICE EMPLOYEES INTERNATIONAL UNION-UNITED HEALTHCARE WORKERS WEST; ST. JOHN'S WELL CHILD & FAMILY CENTER; and NATIONAL DAY LABORER ORGANIZING NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> DIANA DOOLEY, as Secretary, California Health and Human Services Agency, JENNIFER KENT, as Director, California Department of Health Care Services, CALIFORNIA HEALTH AND HUMAN SERVICES AGENCY, CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, and DOES ONE through TWENTY inclusive, <br><br> Defendants. | Case No.: <br><br> **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   CONTINUED ATTORNEYS FOR PLAINTIFFS

2   Timothy P. Fox (SBN 157750)
    CIVIL RIGHTS EDUCATION AND
3   ENFORCEMENT CENTER
    104 Broadway, Suite 400.
4   Denver, CO 80203
    Telephone: (303) 757-7901
5   Facsimile: (303) 595-9705
    Email: tfox@creeclaw.org
6
    Catha Worthman (SBN 230399)
7   Darin Ranahan (SBN 273532)
    FEINBERG, JACKSON,
8   WORTHMAN & WASOW LLP
    383 4th St., Ste. 201
9   Oakland, CA 94607
    Telephone: (510) 269-7998
10  Facsimile: (510) 269-7994
    Email: catha@feinbergjackson.com
11          darin@feinbergjackson.com

12  Ana de Alba (SBN 253917)
    LANG, RICHERT & PATCH
13  Fig Garden Financial Center
    5200 North Palm Ave., Fourth Floor
14  Fresno, CA 93704
    Telephone: (559) 228-6700
15  Facsimile: (559) 228-6727
    Email: ada@lrplaw.net
16
    Noah Phillips (SBN 306832)
17  LAW OFFICES OF NOAH PHILLIPS
    125 12th St., Suite 100 – BALI
18  Oakland, CA 94607
    Telephone: (510) 485-8036
19  Facsimile: (510) 298-5966
    Email: noah@noahphillips.legal
20

21

22

23

24

25

26

27

28

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Jurisdiction and Venue .......................................................................................................... 4

Parties ................................................................................................................................... 4

    I.      Individual Plaintiffs/Petitioners. ............................................................................ 4

          A.      Saul Jimenez Perea and Mother, Analilia Jimenez Perea ............................ 4

          B.      Esther Castañeda ........................................................................... 6

          C.      Rebecca Binsfeld ........................................................................... 8

          D.      Ofelia Jardon ............................................................................. 10

    II.     Organizational Plaintiffs/Petitioners. .................................................................... 11

          A.      SEIU-UHW by and Through Its Community Division ............................. 11

          B.      St. John's Well Child and Family Center .................................................. 13

          C.      National Day Laborer Organizing Network (NDLON) ............................. 14

    III.    Defendants ............................................................................................................ 14

Class Allegations ................................................................................................................. 15

Statement of Facts ................................................................................................................ 17

    I.      Medi-Cal Participants Have Substantially Worse Access to Health Care Than Their Counterparts Covered by Medicare and Other Insurance. ........................... 17

    II.     Medi-Cal Participants' Unequal Access to Health Care Is Driven by the Low Number of Providers Participating in Medi-Cal. .................................................... 19

    III.    Defendants' Low Reimbursement Rates, Administrative Practices, and Inadequate Monitoring of Medi-Cal Participants' Access to Health Care Result in Inadequate Provider Participation ................................................................................................ 21

          A.      Fee for Service ............................................................................. 21

          B.      Capitation Rates for Medi-Cal Managed Care ........................................... 21

          C.      Low Payments to Providers Result in Fewer Providers Willing to Treat Medi-Cal Participants .................................................................... 23

    IV.    As Medi-Cal Has Become More Latino, the State Has Disinvested from the Program, with the End Result Being Two Separate, Unequal Systems for Provision of Health Care in the State. ...................................................................................... 24

    V.     Defendants Fail to Adequately Monitor or Enforce Network Adequacy Standards. .............................................................................................................. 26

1

VI.    Defendants Also Create Administrative Burdens for Medi-Cal Providers and
       Participants, Thereby Limiting Access to Care....................................................... 28

Causes of Action ......................................................................................................... 29

Prayer for Relief........................................................................................................... 34

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

1.      This complaint challenges ongoing civil rights violations in Medi-Cal, California's Medicaid health insurance program, arising from low reimbursement rates to physicians and clinicians, as well as from barriers to access that deny meaningful health care to the over thirteen million people covered by Medi-Cal insurance, about a third of the state, the majority of them Latinos. Medi-Cal covers low-income families, seniors, persons with disabilities, children in foster care, and pregnant women, as well as childless adults with incomes below 138 percent of the federal poverty level—e.g., in 2016, $16,395 for a single person or $33,534 for a family of four. The law requires that Defendants provide Medi-Cal participants with access to medical care equivalent to the access afforded to people with other insurance coverage, including employer-sponsored insurance and Medicare. Defendants are failing in this duty. Instead, Defendants set arbitrarily low reimbursement rates for physician and clinician services and fail to ensure that Medi-Cal participants have timely access to quality health care. As a result, Medi-Cal participants suffer from greater pain, illness, and undiagnosed and untreated serious medical conditions—with significant impact to their overall health—than do their fellow Californians with other insurance.

2.      The State's failure to provide Medi-Cal participants with equivalent access to health care disparately impacts Latinos, while harming Californians of all races who are covered by this Latino-identified program. In contrast to the disproportionately and majority Latino Medi-Cal program, other insurance disproportionately serves white Californians. In effect, California has created a separate and unequal system of health care, one for the insurance program with the largest proportion of Latinos (Medi-Cal), and one for the other principal insurance plans, whose recipients are disproportionately white.

3.      State and federal laws require that Defendant state agencies and officials fulfill their legal duty to provide access to medical services that is equivalent to the access that other Californians have. California law provides that Medi-Cal is intended to allow "eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." Cal. Welf. & Inst. Code § 14000(a). The federal Medicaid Act provides that Medi-Cal reimbursement rates must be

"adequate to enlist providers for the level of care and services . . . available to the general population" and that medical care must "be provided with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(30)(A); 42 U.S.C. § 1396a(a)(8). Civil rights law prohibits denial of "the equal protection of the laws," and prohibits state officials from using "criteria or methods of administration that . . . have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification," and that "have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of . . . [a] program with respect to a person of a particular ethnic group identification." Cal. Const., art. I § 7(a), art. IV § 16(a); 2 Cal. Code Regs. § 11154. Defendants have violated their duties under these and other laws to provide access to health care on a non-discriminatory basis.

4.     Medi-Cal has failed to provide access to health care comparable to the access afforded to Californians covered by other insurance, such as Medicare or employer-sponsored insurance. Medi-Cal participants are denied care they need, suffer extensive delays before they can make appointments, have to travel longer distances to find providers willing to treat them, and experience differences in the quality of treatment they receive as compared to people with other forms of insurance. These delays, denials, distances traveled, and differences in treatment cause needless suffering and worsen already serious, even life-threatening medical conditions.

5.     The unequal treatment Medi-Cal participants experience stems in large part from Medi-Cal's extremely low payments to providers, particularly to physicians and clinicians. Many providers report that Medi-Cal payments are below their cost of providing care, regardless of whether they are paid through fee-for-service (FFS) or Medicaid managed care (MMC). Medi-Cal pays providers a fraction of what Medicare and employer-sponsored insurance pay, the two types of health insurance, aside from Medi-Cal, that cover the vast majority of insured Californians and which the Medicaid Act establishes as benchmarks for ensuring adequate access. Medi-Cal's provider reimbursement rates are among the lowest in the nation. In fee-for-service, California's ratio of Medicaid to Medicare reimbursement for all services, 52 percent, ranks *forty-eighth* out of fifty Medicaid programs in the United States. For primary care, Medi-Cal's 2016 reimbursement rate was just 41 percent of Medicare's reimbursement rate for the same measured

services, ranking *forty-ninth* out of fifty Medicaid programs in the United States. Payments to providers in Medi-Cal managed care are similarly low, about the same as fee-for-service rates. Across all forms of payment, California's per enrollee Medi-Cal spending is near the bottom of any Medicaid program.

6.    Further, since 2000, Defendants have reduced Medi-Cal reimbursement rates relative to Medicare as Medi-Cal has become more heavily Latino, disinvesting in Medi-Cal to the detriment of all Medi-Cal participants. While, in 2000, Medi-Cal rates were about two-thirds of Medicare rates, they have now fallen to just above half those rates. In fact, the vast majority of reimbursements for Medi-Cal have fallen or remained stagnant since at least 2001, while other insurers have continued to improve their payments to providers. Meanwhile, the numbers of Latinos with Medi-Cal has grown three-fold, from 2.3 million in 2000 to 7.2 million in 2016, and the majority of people with Medi-Cal are now Latino. As Medi-Cal reimbursement rates have fallen relative to other insurance, already strained access to care under Medi-Cal has grown worse.

7.    Defendants have failed to adequately monitor and ensure access to health care or to enforce network adequacy requirements, and also have imposed unnecessary and unjustified administrative burdens on Medi-Cal participants and providers, which further impede access to care. The State has failed to enforce managed care plans' legal requirements to: a) include a minimum number of primary care providers per participant in their networks, b) ensure appointment availability within a maximum number of days, and c) provide for physicians within a maximum distance or travel time from where participants live. The State imposes administrative burdens on providers and participants, including rendering referrals to specialists exceedingly difficult to obtain; delaying payments to providers; and unreasonably clawing back payments from Medi-Cal providers, many months or years after treatment, and rescinding treatment authorizations even after treatment has already been provided in good faith on such authorization. None of these burdens apply to the same extent to participants or physicians other insurance plans.

8.    The State's low reimbursement rates and other burdens the State imposes on

providing care to Medi-Cal patients, as well as the State's failure to fulfill its fundamental responsibility to ensure adequate access, have the purpose and effect of defeating or substantially impairing the objectives of the Medi-Cal program, including the objectives to provide meaningful, timely access to health care and to provide access to care that is equivalent to the access other insured populations enjoy. Defendants' acts and omissions have an unjustified disparate impact on the disproportionately Latino Medi-Cal population and constitute purposeful discrimination. The resulting separate and unequal system of health care violates the protections of California Government Code section 11135, its implementing regulations, and the California Constitution.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the Government Code section 11135 claims pursuant to Government Code section 11139; over the request for a Writ of Mandate under Code of Civil Procedure section 1085; and to grant injunctive and declaratory relief under Government Code section 11135, Article VI, Section 10 of the California Constitution, and Code of Civil Procedure sections 410.10, 525, 526, 526a, and 1060.

10.     Venue in Alameda County is appropriate under Code of Civil Procedure sections 395(a) and 401(a) in that the Defendants reside in Sacramento County and the Attorney General has an office in Alameda County.

## PARTIES

I.     **Individual Plaintiffs/Petitioners.**

A.     **Saul Jimenez Perea and Mother, Analilia Jimenez Perea**

11.     Saul Jimenez Perea is a Latino Medi-Cal participant. He is 33 years old and resides in Lake County. Since his birth, Mr. Jimenez Perea has had cerebral palsy and has been semi-paraplegic. His mother, Analilia Jimenez Perea, who is 56 years old, coordinates Mr. Jimenez Perea's care.

12.     Mr. Jimenez Perea has a number of complex medical conditions that require regular access to specialists. He has a history of severe seizures that have required frequent hospitalizations. Until he turned 21 in 2005, he received comprehensive and regular coverage for

his condition through the California Children's Services ("CCS") program, as well as assistance and support from Shriner's Hospital. When he turned 21, Mr. Jimenez Perea lost CCS coverage and support from Shriner's. After some struggles to find coverage, his social worker helped him enroll in regular, full-scope Medi-Cal. Later, as part of the mandatory enrollment in Medi-Cal managed care, he enrolled in the Partnership HealthPlan of California ("PHP").

13.    Around the time he enrolled in PHP, Mr. Jimenez Perea was having grand mal seizures every month. These seizures were so severe that they regularly sent him to the emergency room. Mr. Jimenez Perea was supposed to see a neurologist every 6 to 12 months, but neurologists to whom he was referred declined to see him due to his Medi-Cal coverage, and his mother could not find anyone willing to see him. Mr. Jimenez Perea's primary care physician tried repeatedly to assist with the neurology referrals and eventually secured a referral to a doctor at the University of California, San Francisco (UCSF). The UCSF neurologist did not have any available Medi-Cal appointments, however, and the office told his mother to call back every two to three weeks to see where she was on the waiting list. Eventually, the family secured another referral from the primary care doctor, but then Mr. Jimenez Perea had to wait another three months for his appointment. He finally saw the neurologist on October 30, 2015. Thus, it was more than a year and a half before Mr. Jimenez Perea was able to get an appointment with a neurologist, during which time he continued to have serious seizures.

14.    Mr. Jimenez Perea also needs to see an ophthalmologist because hypertension linked to his cerebral palsy puts him at high risk for glaucoma and thus for blindness. He is supposed to see the ophthalmologist every three to six months. For a while, Mr. Jimenez Perea saw an ophthalmologist in an eye specialist practice. The doctor eventually refused to treat him, saying he could no longer afford to take Medi-Cal patients. The nurse at the practice told his mother that Medi-Cal paid "too little and too late." Ms. Jimenez Perea tried to find her son another ophthalmologist, but had to try three different providers before she finally found one that would accept Medi-Cal. Then, Mr. Jimenez Perea had to wait another three months for his evaluation. All told, he waited a year for his needed ophthalmologist visit. Now, he has his eyes checked at Costco and his mother pays out of pocket for visits to an ophthalmologist in Mexico

1    because otherwise the delays are too long between appointments.

2         15.    Mr. Jimenez Perea also has hepatitis C, as a result of blood transfusions he has

3    received. Prior to his enrollment in PHP, he was able to see a doctor at a liver specialist's office.

4    But after several years, he and his mother were told that the clinic would no longer accept Medi-

5    Cal. Mr. Jimenez Perea then had to wait many months to see a different specialist for the hepatitis

6    treatment, again experiencing long delays because of his Medi-Cal status.

7         16.    Ms. Jimenez Perea has sought help from her son's social workers. Even with the

8    help of trained social workers who have endeavored to assist, including by calling Medi-Cal on

9    her son's behalf, the Pereas were not able to get Mr. Jimenez Perea the care he needed on a timely

10    basis.

11         17.    If Mr. Jimenez Perea had been covered by another form of insurance, he would

12    have received medical care with fewer delays and denials, less distance traveled, and better

13    quality of care than he received on Medi-Cal.

14         **B.    Esther Castañeda**

15         18.    Esther Castañeda is a 56-year-old Latina covered by Medi-Cal who lives in

16    Sacramento, California. She enrolled in Medi-Cal in 2014 and joined the Anthem Blue Cross

17    Medi-Cal managed care plan.

18         19.    Ms. Castañeda suffered for more than a year with intense abdominal pain because

19    she could not get surgery scheduled to remove her gallbladder. The problem first began in

20    February 2015, when she experienced such severe pain that she had to go to the emergency room.

21    She could not sit or lie down, and was vomiting. The emergency room doctors diagnosed Ms.

22    Castañeda with cholestasis, or gallstones. They prescribed her strong pain medication and told her

23    to seek an immediate appointment with her primary care physician, within 1 to 2 days, to get a

24    referral to surgery. Ms. Castañeda was not able to get an appointment with her primary care clinic

25    until more than a week later, on March 6, 2015. At her appointment, the clinic told Ms. Castañeda

26    to make an appointment with a general surgery specialist, and entered the referral.

27         20.    Nearly every day, Ms. Castañeda called the clinic to inquire about the status of the

28    referral, sometimes going in person to the clinic. She continued to suffer from severe pain. She

could not eat and was vomiting often. Eventually, Ms. Castañeda received an appointment with a general surgery specialist for April 24, 2015—2 months after her initial visit to the emergency room but the general surgery specialist's office later cancelled the appointment. Ms. Castañeda was told by the specialist's office that they did not take Medi-Cal after all. Ms. Castañeda's primary care physician had to re-enter the same referral multiple times to different surgeons. Ms. Castañeda felt hopeless and stopped eating to minimize the pain and avoid vomiting.  She lost over 30 pounds and the pain made her anxious and fearful.

21.    Finally, Ms. Castañeda received a notice that she had an appointment for October 15, 2015 with the same general surgeon in Folsom with whom her appointment had been scheduled in April. But Ms. Castañeda could not wait until October 15. Two days before the scheduled appointment, she was in the emergency room with severe abdominal pain, nausea, and vomiting. The emergency room doctor noted that she had an appointment with the surgeon on October 15. The day after she was discharged, she received a phone call telling her that the October 15 appointment with the surgeon had been canceled. She felt despair.

22.    Ten months after she was initially diagnosed, in December 2015, Ms. Castañeda's clinic was still pursuing the referral for her surgery. She continued to call and visit the clinic regularly to urge that she needed to see a specialist. Finally, on January 14, 2016, she received approval for another referral to the same doctor who had already cancelled her appointment twice for insurance reasons.

23.    Meanwhile, Ms. Castañeda was in Mexico with her family in February 2016, when the pain became overwhelming. She decided to have the operation done there. Her family put together the funds to pay for the surgery out-of-pocket. The doctor in Mexico diagnosed her with chronic lithiasic choleystitis, inflammation caused by the presence of the gallstones. It was the very diagnosis the surgery she had been trying to receive is meant to prevent. The doctor said she was at risk of death if she put off the surgery any longer. He operated to remove her gallbladder, and said that it would take months for her to recover. For more than a year, she has not been able to work full time due to the pain and weakness she has experienced from gallstones and the subsequent surgery.

1  24.  If Ms. Castaneda had been covered by another form of insurance, she would have

2  received her surgery sooner, rather than having to wait more than 10 months while suffering

3  severe pain, nausea, and almost dying from awaiting a routine surgery.

4  **C.  Rebecca Binsfeld**

5  25.  Rebecca Binsfeld is a 35-year-old mother of four living in Sacramento with her

6  husband and children, all covered by Medi-Cal. Ms. Binsfeld is white, and her husband and

7  children are Latino.

8  26.  Ms. Binsfeld has Systemic Lupus, a chronic and lifelong autoimmune disease that

9  causes the immune system to attack the body's own tissue and organs, including the joints,

10  kidneys, heart, lungs, brain, blood, and skin. Semiannually, Ms. Binsfeld must see a

11  rheumatologist for her lupus and an ophthalmologist to check her eyes for blindness due to her

12  lupus medications. She also requires prompt visits for evaluation and treatment within 24 hours

13  when she is having a painful flare. Flares can be mild, moderate, or severe. Severe flares can

14  cause damage to the organs, or even kidney disease or failure.  Ms. Binsfeld experiences the

15  flares as extreme fatigue to the point where she does not want to get out of bed, her whole body

16  hurts, her joints ache, she can't grip well, and she suffers from headaches and general weakness.

17  27.  Ms. Binsfeld was previously provided health care under Medi-Cal at the UC Davis

18  Medical Center through the Health Net managed care plan. In or around January 2015, UC Davis

19  stopped accepting Medi-Cal because of its low reimbursement rates. When she was first dropped

20  from UC Davis, Ms. Binsfeld called at least fifteen providers from the book provided for Health

21  Net participants. Each provider was either too far away, was not accepting new patients, or the

22  first available appointment was months out. It took her four months after she started calling

23  primary care doctors to find one that would see her, at a primary care clinic called HALO, a

24  Federally Qualified Health Center (FQHC) that she found through word of mouth. At her very

25  first visit, the primary care physician entered a referral for her to see a rheumatologist and

26  ophthalmologist. UC Davis then gave her one more courtesy visit since her regular

27  rheumatologist knew that she would have trouble accessing other specialty care. She needed to

28  see a regular specialist, not just to receive medication that helps treat the flares, but to evaluate the

VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT

1    cause of the flares and to adjust her treatment plan to avoid them in the future.

2        28.    Throughout that spring and summer, the referrals were re-entered and re-extended

3    while she went to the emergency room to deal with symptoms of lupus flares. She called the

4    clinic as well as the specialists, who only told her to return to the clinic to request another referral.

5    By October of 2015, she was developing myalgia and joint pain because of her disease.

6        29.    Finally, in February 2016, she was able to schedule an appointment with a

7    rheumatologist, 10 months after her one-time courtesy visit with her UC Davis specialist. In 2016,

8    she saw the specialist a total of 5 times. This was not sufficient. Because she suffered from a

9    cycle of lupus flares and since it took months to schedule an appointment, Ms. Binsfeld was not

10    prescribed the medication when she needed it most. She has continued to make several visits to

11    the emergency room because of the lupus flares.

12        30.    More than a year after the original referral was entered, Ms. Binsfeld finally saw

13    an ophthalmologist in August 2016. She kept trying to get an earlier appointment but was told

14    that no earlier appointment was available. The last time she had seen an ophthalmologist was in

15    January 2014.

16        31.    Overall, the egregious delays for a rheumatologist and ophthalmologist were

17    harmful to Ms. Binsfeld's health.

18        32.    Ms. Binsfeld's husband, Carlos de Jesus, who is 43 years old, is also on Medi-Cal

19    through Health Net, as is their daughter, Gloria de Jesus, who is 16 years old. Both family

20    members have also suffered long delays in getting appointments with needed specialists because

21    of their Medi-Cal status.

22        33.    Mr. de Jesus suffers from chronic back pain from a previous injury. He has called

23    doctor after doctor, and has had to go to the emergency room when unable to schedule timely

24    appointments.

25        34.    Like her parents, Gloria de Jesus suffers from several significant health problems:

26    she has a heart murmur, a learning disability, and scoliosis that has necessitated two spinal

27    surgeries. In early 2016 or late 2015, Gloria had a seizure. She went to HALO Community Clinic

28    to get a referral to a neurologist, but it took two months for her to get an appointment. At that

9    VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT

1    appointment, the neurologist didn't take any action. Over the summer, Gloria had another seizure
2    and ended up in the emergency room. She was diagnosed with epilepsy, but her family has had
3    difficulty scheduling regular appointments with a neurologist. Her last appointment was cancelled
4    and rescheduled three times, causing a delay of about two months beyond when she was supposed
5    to see the neurologist for follow up.

6         35.    If Ms. Binsfeld and her family were covered by another form of insurance, they
7    would be receiving medical care with fewer delays and denials, and better quality of care than
8    they have on Medi-Cal.

9              **D.    Ofelia Jardon**

10        36.    Ofelia Jardon is a 58-year-old Latina with Medi-Cal coverage who resides in
11   Fresno. She first enrolled in Medi-Cal several years ago and joined the CalViva managed care
12   plan, and was then assigned to the First Choice Medical Group independent physicians
13   association.

14        37.    Ms. Jardon has suffered severe back pain since around 2011, when she was first
15   diagnosed with scoliosis (a curved spine) and spondylolisthesis (a bone that slides back and forth
16   across another bone in the back). At the end of January 2015, Ms. Jardon's back pain became so
17   severe that she was unable to work or perform her daily activities at home. On February 4, 2015,
18   she saw her primary care doctor at the local FQHC, Clinica Sierra Vista, who referred her to
19   radiology and for other diagnostic testing. The testing was performed in February, but it took
20   more than two months for the results. On May 1, 2015, Ms. Jardon was referred to neurosurgery
21   with a diagnosis of lumbar degenerative disc disease. On July 6, 2015, Ms. Jardon saw her
22   primary care doctor for worsening back pain. The neurosurgery referral was still pending, and the
23   clinic tried to expedite the referral.

24        38.    But, Ms. Jardon was unable to get a timely appointment with a neurosurgeon in
25   Fresno. Instead, she had to wait until October 26, 2015, to be seen by a neurosurgeon in San
26   Francisco at the University of California, San Francisco (UCSF)—almost six months after the
27   referral had been entered, and nine months after she first came to her primary care clinic with
28   extreme back pain. Her appointments at UCSF required travel of three hours or more each way

from her home in Fresno. The surgery that was performed is a routine back surgery, and although there are neurosurgeons in Fresno equally qualified to perform the surgery Ms. Jardon needed, none would accept the referral from Medi-Cal for Ms. Jardon.

39.     The UCSF doctor determined that Ms. Jardon should have the surgery "asap," based on severe lumbar degenerative disease with spondylolisthesis and severe canal and foraminal stenosis. Her surgery was not performed until a month later, November 20, 2015.

40.     Although Ms. Jardon was supposed to have physical therapy almost immediately after her surgery, and she began following up right away to try to schedule these appointments, she was not able to schedule a physical therapy appointment until January 2016.

41.     Ms. Jardon continued to have back problems after her surgery and had to return to see the UCSF surgeon for follow-up visits, again traveling 3 hours each way.

42.     If Ms. Jardon were covered by another form of insurance, she would have received medical care with fewer delays and denials, less distance travelled, and better quality of care than on Medi-Cal.

## II.     Organizational Plaintiffs/Petitioners.

### A.     SEIU-UHW by and Through Its Community Division

43.     Headquartered in Oakland, California, Service Employees International Union—United Healthcare Workers West (SEIU-UHW) is California's largest health care worker union. It includes more than 93,000 members who are frontline caregivers, including respiratory care practitioners, as well as dietary, environmental services, and nursing staff. They work in hospitals, clinics, nursing homes, laboratories, and other health care facilities.

44.     SEIU-UHW's Community Division includes approximately 6,000 leaders and supporters who are not covered by SEIU-UHW collective bargaining agreements. These leaders and supporters are Medi-Cal patients, low-wage workers, and others concerned about the adverse effect of the Medi-Cal program on their families and communities.

45.     Improving Medi-Cal is a core goal for the Community Division, which grew out of SEIU-UHW's efforts to enroll thousands of people into Medi-Cal. As a result of this enrollment effort, staff, leaders, members, and supporters became aware of Medi-Cal enrollees' inability to

receive timely access to needed health care, sometimes with tragic consequences. For example:

      a.  Community Division supporter Rosa Gomez's 10-year old daughter, Gaby, suffered from intense vomiting and weakness for several months and was in and out of the emergency room while she waited for an appointment with a specialist; eventually she was diagnosed with advanced brain cancer, from which she died.

      b.  Community Division supporter Leslie Maya Daugherty bled intensely from fibroids in her uterus and was unable to find a doctor near her willing to do a standard surgery to save her uterus; she was forced to travel more than 180 miles to San Francisco for the surgery. As a carrier of the sickle cell gene, Ms. Daugherty also experienced intense pain, bleeding, and anemia while waiting for treatment for her fibroids.

      c.  Community Division supporter Maribel Reyes and her husband Juan España drive their teenage son, Juan España, Jr., more than 300 miles from San Jose to Los Angeles each month for a life-saving blood treatment he must receive, even though there is a facility in Northern California that could treat him. Medi-Cal reimbursement rates are so low that the doctor in Northern California says he cannot afford to provide the treatment.

      d.  Community Division supporter Matilde Valle suffered from pain and discharge from her belly button for many months before being diagnosed with an umbilical hernia that needed surgery, a surgery that would normally be performed right away for someone in her condition covered by private insurance.

46.    These and the experiences of many, many Medi-Cal participants who belong to the Community Division have led SEIU-UHW to launch a campaign to "fix Medi-Cal," aimed at ensuring that people with Medi-Cal can receive the meaningful access to care to which they are entitled.

**B.    St. John's Well Child and Family Center**

47.    St. John's Well Child and Family Center, located in South Los Angeles, is an independent 501(c)(3) community health center that serves patients of all ages through a network of 13 Federally Qualified Health Centers (FQHCs) and school-based clinics, as well as two mobile clinics that serve the homeless. The mission of St. John's has been to eliminate health disparities and foster community well-being by providing and promoting the highest quality care in South Los Angeles.

48.    St. John's does not turn anyone away for inability to pay. The services it provides include primary care, mental health, dental care, and care management for complex conditions. St. John's provides about 300,000 patient visits a year to about 85,000 unduplicated patients, the vast majority of them living below 100 percent of the Federal Poverty Level, with over half covered by Medi-Cal. Many Medi-Cal patients come to St. John's after they are unable to schedule appointments with their assigned primary care providers in other managed care organizations.

49.    In 2015, St. John's patient population was approximately 83 percent Latino. This percentage has grown over time. In 2013, for example, 76 percent of the patients served by St. John's were Latino.

50.    St. John's is a contracted clinic partner with Health Care LA, IPA (HCLA), an "independent physicians' association." Through HCLA, St. John's cares for patients enrolled with government-sponsored managed care programs in Medi-Cal and Medicare Advantage, as well as "dual eligibles" (i.e., patients covered by both Medicare and Medi-Cal). The Medi-Cal payments that the Health Care LA IPA receives, portions of which are passed on to St. John's, are extremely low. The IPA, which establishes its own network, has determined it must pay all its specialists above Medicare rates in order to ensure adequate access. This means that an insufficient amount remains to cover full-scope comprehensive primary care services, delivered at St. John's, along with coordination of care and administration. The low Medi-Cal rates and the State's arbitrary administrative practices jeopardize St. John's ability to fulfill its fundamental mission to provide its clients with timely access to high-quality health care.

C.      **National Day Laborer Organizing Network (NDLON)**

51.     The National Day Laborer Organizing Network (NDLON) is a non-profit organization whose headquarters is in Los Angeles County.  NDLON is a nationwide network of organizations that work with day laborers.

52.     The aims of NDLON include improving the lives of day laborers in the United States by fostering safer, healthier, more humane environments for day laborers to earn a living, contribute to society, and integrate into the communities where they live and work.

53.     NDLON and its member organizations undertake work on day laborers' health and safety needs because day workers are injured, suffer illnesses, and die on the job at dangerously high rates.

54.     NDLON, and its member organizations, work with day laborers who reside in California and are Medi-Cal participants themselves and/or have children who are Medi-Cal participants.

III.    **Defendants.**

55.     Defendant Department of Health Care Services ("DHCS") is charged with administering the Medi-Cal program "in order to secure full compliance with the applicable provisions of state and federal laws."  Welf. & Inst. Code § 10740. It is California's "single state agency" designated to administer or supervise the administration of the Medicaid program under Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396a(a)(5) (each state providing Medicaid must "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the [Medicaid] plan"); 42 C.F.R. § 431.10; Welf. & Inst. Code § 14100.1 (designating DHCS the single state agency). As such, DHCS is responsible for setting Medi-Cal's fee-for-service reimbursement rates and managed care capitation rates, as well as for administering the program in a manner compliant with its obligations to ensure adequate access to care and the duty of nondiscrimination.

56.     Jennifer Kent, Director of DHCS, is responsible for setting Medi-Cal's fee-for-service reimbursement rates and managed care capitation rates that this complaint challenges and is responsible for administering the Medi-Cal program and ensuring that Medi-Cal patients in

1    managed care plans have proper access to services. Welf. & Inst. Code § 10721.

2        57.    California Health and Human Services Agency ("HHSA") is the parent entity of

3    the Department of Health Care Services.

4        58.    Diana S. Dooley is the Secretary of HHSA. She oversees the Medi-Cal program,

5    including setting of the fee-for-service and capitated managed care Medi-Cal reimbursement rates

6    that this complaint challenges. Gov. Code §§ 12803, 12850, 12850.4.

7                        **CLASS ALLEGATIONS**

8        59.    Pursuant to Code of Civil Procedure section 382, the Individual Plaintiffs bring

9    this action for injunctive and declaratory relief on their own behalf and on behalf of a class of all

10   other Medi-Cal participants, excluding persons with dual eligibility for Medicare. The claims

11   asserted in this complaint are solely for injunctive and declaratory relief for the class, to provide

12   equal access to health care for people with Medi-Cal. This complaint does not seek damages.

13       60.    The persons in the class are so numerous that joinder of all such persons is

14   impracticable, and the disposition of their claims in a class action is a benefit to the parties and to

15   the Court. Individual Plaintiffs are informed and believe that over 13 million people are enrolled

16   in Medi-Cal, 90 percent of whom are not dual-eligible for Medicare.

17       61.    There is a well-defined community of interest in the questions of law and fact

18   affecting the class in that they are all subject to the same acts and omissions by Defendants that

19   cause the discrimination at issue, including Defendants' inadequate reimbursement rates;

20   Defendants' failures to ensure that provider payments are adequate to enlist sufficient providers to

21   provide care that is accessible to the same degree as that received by the remainder of the

22   California population; Defendants' failures to monitor and ensure access and network adequacy;

23   and Defendants' imposition of administrative burdens impeding access to care.

24       62.    Common questions of law and fact predominate over questions affecting

25   individual members. Common questions of law and fact include questions raised by the

26   Individual Plaintiffs' allegations that Defendants have discriminated against them by failing to

27   provide equal access to health care as the law requires. Predominant common questions of law

28   and fact include, but are not limited to, the following:

a.  Whether Defendants have set fee-for-service reimbursement and managed-care capitation rates adequate to assure equal access;

b.  Whether Defendants have failed to ensure payments to providers in managed care adequate to assure equal access;

c.  Whether Defendants have set rates based on arbitrary financial constraints, rather than to ensure the objectives of the program are fulfilled;

d.  Whether Defendants have failed to provide or ensure meaningful access to specialists and primary care physicians for Medi-Cal participants;

e.  Whether Defendants have imposed unnecessary administrative burdens on Medi-Cal participants and providers;

f.  Whether Defendants have disinvested from Medi-Cal as the program has become more Latino;

g.  Whether Defendants' acts and omissions have resulted in a significant disparate impact on Latinos, including unavailability of sufficient specialty and primary care providers willing and available to treat Medi-Cal participants;

h.  Whether Defendants' acts and omissions have defeated or substantially impaired the objectives of the Medi-Cal program;

i.  Whether Defendants can rebut Plaintiffs' showing of disparate impact with a legally sufficient necessity;

j.  Whether Plaintiffs are entitled to declaratory relief that Defendants have violated California Government Code section 11135 and the California Constitution; and

k.  Whether this Court should issue an injunction that Defendants cease and desist their discriminatory practices, and that Defendants take steps to ensure equal access to care for Medi-Cal participants.

63.  The claims of the Individual Plaintiffs are typical of the claims of the class as a whole because the Individual Plaintiffs are similarly affected by Defendants' acts and omissions.

64.    The Individual Plaintiffs are adequate class representatives because they are directly affected by Defendants' acts and omissions. The interests of the Individual Plaintiffs are neither antagonistic to nor in conflict with the interests of the class as a whole. The attorneys representing the class are experienced in representing clients in class actions involving civil rights claims.

65.    Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, making appropriate final declaratory and injunctive relief with respect to the class as a whole.

66.    References to Plaintiffs shall be deemed to include each Individual Plaintiff and each member of the class, unless otherwise indicated.

## STATEMENT OF FACTS

**I.    Medi-Cal Participants Have Substantially Worse Access to Health Care Than Their Counterparts Covered by Other Insurance.**

67.    The Individual Plaintiffs, like others with Medi-Cal, are being denied needed medical care, suffering from delays in obtaining care, traveling long distances to obtain care, and receiving lower quality care than if they were covered by other forms of insurance that cover others in the general California population. Plaintiffs have substantially less access to health care than Medicare participants and those with employer-sponsored insurance (ESI), by far the two other most predominant forms of receiving health insurance in California.

68.    In 2015 (the most recent available year of data), when compared to those with Medicare or employer-sponsored insurance, Medi-Cal participants were significantly more likely to receive their care at an emergency room or urgent care, or to lack a usual source of care entirely. With respect to primary care, Medi-Cal participants were significantly more likely to report difficulty finding care and to have had their insurance coverage rejected by a provider. With respect to specialty care, Medi-Cal participants were even more likely to report difficulty finding care and to have had their insurance coverage rejected by a provider. From 2013 to 2015, 24 percent of Medi-Cal participants who tried to get an appointment within two days because they were sick or injured were *never* able to get such a doctor appointment, compared to 9 percent of

1    those with Medicare who tried and 8 percent of those with employer-sponsored insurance who

2    tried, while another 24 percent of those Medi-Cal participants were only sometimes able to get

3    such an appointment, compared to 13 percent of those with Medicare and 12 percent of those with

4    employer-sponsored insurance.



**Source**: UCLA Center for Health Policy Research, 2015 California Health Interview Survey.

69.    Access to care for Medi-Cal participants has gotten worse since 2000. For

example, from the early 2000s to 2015, Medi-Cal participants became much more likely not to

have a usual source of care other than an emergency room, and to have had *no* visits with

physicians in the preceding 12 months.

70.    Medi-Cal health maintenance organizations (HMOs), a type of managed care plan,

have received significantly worse rankings than their employer-sponsored insurance and

Medicare counterparts, across the board, in such areas as patients' ability to get care quickly and

easily; patients' satisfaction with the quality of care and their health plan; the proper receipt of preventative services like breast and colorectal cancer screening, flu shots, pneumonia shots, and BMI assessments; and the proper receipt of treatments for acute and chronic illnesses, such as diabetes, heart disease, and mental illness.

71.    Due to difficulties accessing primary and specialty care, Individual Plaintiffs' and other Medi-Cal participants' chronic and acute conditions go untreated or are not adequately treated. For example, Medi-Cal participants are particularly likely to be initially diagnosed at late stages with breast, colon, and rectal cancer; and particularly unlikely to receive breast-conserving surgery or to receive recommended radiotherapy for breast cancer.

72.    The Individual Plaintiffs' stories exemplify the access problems borne out by the data. For example, Saúl Jimenez Perea was unable to see a neurologist for about a year and a half while he was experiencing grand mal seizures. The delay for Esther Castañeda was so long that she almost died while waiting for surgery. Rebecca Binsfeld has had to wait months to receive treatment for her lupus, all the while experiencing debilitating and dangerous flares. Ofelia Jardon had to travel from Fresno to the Bay Area for a common back surgery. These stories—like those of the members of the Community Division of SEIU-UHW—are representative of the types of problems that are commonplace among Medi-Cal participants, and are significantly worse than the access problems experienced by those on other insurance.

II.    **Medi-Cal Participants' Unequal Access to Health Care Is Driven by the Low Number of Providers Participating in Medi-Cal.**

73.    A significant cause of Medi-Cal participants' reduced access to care is the limited numbers of physicians willing to treat them. Despite Medi-Cal's high enrollment, substantially fewer physicians provide care to Medi-Cal patients than to Medicare and commercial insurance patients for nearly every type of practice.[1] Certain types of physicians are very unlikely to accept Medi-Cal patients at all, such as general internal medicine, surgery, family medicine, medical specialties, and psychiatry. Indeed, a recent study showed that the number of California

---

[1] Commercial insurance includes both employer-sponsored insurance and other, significantly less common forms of private insurance, such as individually purchased policies.

1    physicians serving Medi-Cal patients was about the same as the physicians serving the uninsured

2    in three important specialties: surgery, emergency medicine, and psychiatry. The percentage of

3    physicians accepting new Medi-Cal patients is even lower than the percentage of physicians with

4    any Medi-Cal patients, presenting a particular challenge for Medi-Cal participants seeking to

5    establish a new physician-patient relationship.

6    74.    Provider participation in Medi-Cal is low as compared to other insurance, and does

7    not meet the network adequacy standards set by State regulation to ensure adequate access to

8    care: the number of full-time-equivalent primary care physicians participating in Medi-Cal is

9    *below* the minimum of one primary care physician per 2000 participants provided for by

10    regulation.

11    75.    Physicians report much greater difficulty obtaining referrals for their Medi-Cal

12    patients compared to their patients with commercial insurance.



Percent of Physicians Reporting Difficulty Obtaining Referrals, by Type of Referral

**Source**: Janet Coffman, MPP, PhD, et al., *Physician Participation in Medi-Cal: Is Supply Meeting Demand?* at 20 (California Health Care Foundation June 2017).

76.    Consequences of difficulties obtaining referrals include delayed diagnosis or

1   treatment, duplication of testing, reduced continuity of care, worsening complications, and
2   untreated chronic or acute conditions.

3        77.    The low number of providers who will see Medi-Cal patients and the small
4   numbers of Medi-Cal patients most providers serve in their practices are fundamental causes of
5   the access problems Medi-Cal participants experience.

6   **III.    Defendants' Low Reimbursement Rates, Administrative Practices, and Inadequate
        Monitoring of Medi-Cal Participants' Access to Health Care Result in Inadequate
7        Provider Participation.**

8        **A.    Fee for Service**

9        78.    Medi-Cal's reimbursement rates for services it covers under the more traditional
10  fee for service (FFS) model are abysmally low. Under FFS, Medi-Cal reimburses providers
11  directly a fixed amount for a particular service, and DHCS pays according to a fixed fee schedule.
12  For all measured services, Defendants reimburse providers who care for Medi-Cal patients just 52
13  percent of what Medicare reimburses providers for the same services, ranking Medi-Cal 48th out
14  of 50 Medicaid programs in the United States. For primary care, Defendants reimburse providers
15  who care for Medi-Cal patients just 41 percent of what Medicare reimburses providers for the
16  same services, ranking Medi-Cal 49th out of 50 Medicaid programs in the United States. For all
17  services, including both primary and specialty care, the ratio of Medi-Cal fee-for-service
18  reimbursement to Medicare reimbursement (52 percent) in California was significantly below the
19  national average ratio (72 percent). The low Medi-Cal reimbursement rates are often below
20  providers' actual cost of doing business.

21       79.    The FFS fee schedule has not kept pace with rates paid by other forms of
22  insurance, and, on the whole, has either stayed the same or decreased since 2001, even before
23  taking medical inflation into account. A number of Medi-Cal participants currently receive
24  services paid for directly by the State through FFS. In addition, DHCS's FFS fee schedule is also
25  used by Defendants as a benchmark to set the managed-care capitation rate, as described below.

26       **B.    Capitation Rates for Medi-Cal Managed Care**

27       80.    Since the 1980s, California has sought to move Medi-Cal participants into
28  managed care. Medi-Cal managed care requires participants to enroll with local managed-care

1  organizations ("MCOs") established by their county of residence, private insurers, or regional
2  bodies.

3      81.    Under Medi-Cal managed care, the State pays MCOs a fixed, "capitated" rate per
4  Medi-Cal participant, which Defendants are supposed to determine based on actuarial
5  assumptions about the cost of care and utilization. These managed-care capitation rates vary by
6  MCO based on assumptions about the MCO's particular insurance pool, i.e., the population of
7  people receiving insurance from that MCO, which may include people whose cost of care varies
8  widely.

9      82.    From these managed-care capitation rates, MCOs then contract with providers—
10  such as individual doctors, physician groups, and hospitals—to provide medical services to their
11  participants, paying those providers either a negotiated fee-for-service amount or a monthly per-
12  member per-month amount (a practice called "sub-capitation"). The negotiated fee-for-service
13  payments made by MCOs to providers are separate from FFS Medi-Cal, described above, under
14  which the State pays a pre-set per-service rate directly to providers, but in practice end up being
15  around the same amount.

16      83.    Presently, the vast majority of Medi-Cal participants are enrolled in managed care.

17      84.    Defendant DHCS sets Medi-Cal managed-care capitation rates under the direction
18  of Defendant Kent, who is overseen by Defendant Dooley and Defendant HHSA.

19      85.    Defendants' Medi-Cal managed-care capitation rates determine whether Medi-Cal
20  participants receive the health care access to which they are legally entitled. Under the Medicaid
21  Act, the MCO must make health services available to the same extent as they would be available
22  to Medi-Cal fee-for-service participants. *See* 42 U.S.C. § 1396b(m)(1)(A)(i). The MCO's
23  reimbursement rates to providers must be, in turn, "sufficient to enlist enough providers so that
24  care and services are available under the plan at least to the extent that such care and services are
25  available to the general population in the geographic area" pursuant to section 30(A), 42 U.S.C.
26  § 1396a(a)(30)(A).

27      86.    It is widely recognized that the managed-care capitation rates paid MCOs have
28  been set arbitrarily low due to Defendants' use of the low Medicaid fee-for-service fee schedule

as a component of the capitation rate-setting process, use of so-called "efficiency factors" to further lower capitation rates, problems in the data relied upon by actuaries to calculate capitation rates, categorically selecting the lower of the range of capitation rates recommended by the actuary, manipulating rates to fit within budget constraints, and other reasons to be established at trial.

87.    Once Defendants set managed-care capitation rates, they update them annually, using the previous year's experience as the baseline for each group. Defendants fail to include a component of evaluating access to care or to consider contract compliance in the managed-care capitation rate-setting process, despite well-documented network inadequacy and other access violations by the MCOs.

88.    In the past, the State explicitly incorporated budgetary factors in the managed-care capitation rate-setting process, first coming up with managed-care capitation rates and then applying a budget factor to reduce the rates. Defendants' method of setting managed-care capitation rates based on the previous year's rates embeds those past budget-based rate decisions into the current capitation rates. On information and belief, the State inappropriately continues to take budgetary considerations into account in the rate-setting process.

89.    Defendants' managed-care capitation rate-setting process results in Medi-Cal managed-care capitation rates that are lower than actuarially equivalent Medicare and employer-sponsored insurance capitation rates and/or premiums for comparable populations.

90.    Unsurprisingly, these low managed-care capitation rates contribute to low payments to providers contracting with Medi-Cal MCOs to provide medical services to Medi-Cal participants, which are typically around the same as FFS rates and fall significantly below rates paid for individuals on Medicare and employer-sponsored insurance.

### C.    Low Payments to Providers Result in Fewer Providers Willing to Treat Medi-Cal Participants.

91.    Defendants fail to set both the fee-for-service rates and managed-care capitation rates high enough to ensure equal access to quality care for Medi-Cal participants, and the insufficient reimbursements make it difficult to enlist specialty and primary care providers.

92.    Physicians overwhelmingly cite low Medi-Cal payments as their reason for limiting the number of Medi-Cal patients they serve.

93.    Physicians' willingness to accept Medicaid patients increases as Medicaid payment rates increase. Acceptance rates by primary care physicians of new Medicaid patients are higher in states where the ratio of Medicaid to Medicare fees is higher.

**IV.    As Medi-Cal Has Become More Latino, the State Has Disinvested from the Program, with the End Result Being Two Separate, Unequal Systems for Provision of Health Care in the State.**

94.    Medi-Cal, now a majority Latino program, is a separate and unequal way of obtaining health care in California compared to other forms of insurance, which are disproportionately white. However, all Medi-Cal participants, as a consequence of this separate and unequal system, are effectively denied full participation in and the full benefits of the Medi-Cal program.

95.    Medi-Cal fee-for-service rates relative to Medicare have fallen as Medi-Cal has become increasingly Latino. According to Defendant DHCS's own data, between 2000 and 2016, the percentage of Latinos as a share of Medi-Cal participants grew steadily, to the point where Medi-Cal participants are now overwhelmingly Latino.[2] At the same time, Medi-Cal fee-for-service reimbursement rates as a share of Medicare rates have fallen to the point where Medi-Cal now only pays 52 percent of what Medicare pays for the same service, compared to 65 percent in 2000. Managed-care reimbursement rates, which are in practice aligned with fee-for-service rates, have similarly dropped over the same time period.

---

[2] The Latino share of Medi-Cal dipped to 54 percent in 2016 from a peak of nearly 60 percent in 2014 as a result of the ACA expansion population (i.e. childless adults up to 138 percent of the poverty line), which was less Latino than the pre-ACA population (i.e. low-income children, families, and people with disabilities). Data from 2016 shows that the proportion of Latinos has resumed its growth since this dip.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



**Sources**: Department of Health Care Services, Medi-Cal Eligibility Data System; Lewin Group; the Urban Institute.

21     96.     Medi-Cal's disproportionately Latino composition stands in stark contrast to the

22     disproportionately white composition of Medicare and employer-sponsored insurance pools,

23     which, together with Medi-Cal, comprise 92 percent of the State's insured populations. While

24     Latinos and white people are each approximately 39 percent of the state population, Medi-Cal is

25     well over half Latino, but less than a quarter white. On the other hand, Medicare is well over half

26     white, but less than a quarter Latino, while ESI is over 40 percent white and under 30 percent

27     Latino. As stated above, access is much better in ESI and Medicare.

28     97.     Moreover, the data strikingly illustrate that current Medi-Cal participants, who are

1   enrolled in a Latino-identified program, are adversely affected by current low reimbursement

2   rates compared to past Medi-Cal participants.  When Latinos were not such a large proportion of

3   participants, reimbursement rates were higher relative to Medicare rates, and participants had

4   much better access to health care.

5       98.    The lower Medi-Cal reimbursement rates today compared to the rates paid by

6   other plans, and even Medi-Cal rates in the past, thus have an adverse, disparate impact on

7   Latinos, because the Medi-Cal participants are disproportionately Latino.

8   **V.    Defendants Fail to Adequately Monitor or Enforce Network Adequacy Standards.**

9       99.    Defendants fail to ensure adequate health care access to Medi-Cal managed care

10  participants, even under their own standards.  Defendants subject MCOs to network adequacy

11  standards in two ways, but then fail to enforce compliance.

12      100.   First, the Department of Managed Health Care (DMHC), which operates under

13  Defendant HHSA, licenses the majority of Medi-Cal MCOs pursuant to the Knox-Keene Health

14  Care Service Plan Act of 1975, Health & Safety Code §§ 1340-1399.864, and its accompanying

15  regulations, 28 Cal. Code Regs. §§ 1000-1300.826. One key objective of Knox-Keene and its

16  implementing regulations is "[e]nsuring that subscribers and enrollees receive available and

17  accessible health and medical services rendered in a manner providing continuity of care." Health

18  & Safety Code § 1342(g).

19      101.   Accordingly, among other requirements, Knox-Keene and its implementing

20  regulations place certain "network adequacy" standards on covered plans. These requirements

21  include timeliness standards, under which MCOs must "ensure that [their] contracted provider

22  network[s] ha[ve] adequate capacity and availability of licensed health care providers to offer

23  enrollees appointments" that meet certain timeframes, including 48 hours for urgent care

24  appointments that do not require prior authorization, 96 hours for urgent care appointments that

25  do require prior authorization, 10 business days for non-urgent primary care appointments, 15

26  business days for non-urgent specialist appointments, and 15 business days for ancillary services.

27  28 Cal. Code Regs. § 1300.67.2.2(c). These also include distance standards and provider-

28  participant ratios, under which "[a]ll enrollees [must] have a residence or workplace within 30

minutes or 15 miles of a contracting or plan-operated primary care provider in such numbers and distribution as to accord to all enrollees a ratio of at least one primary care provider (on a full-time equivalent basis) to each 2,000 enrollees." 28 Cal. Code Regs. § 1300.51(d)(H)(i).

102.    Second, Defendants subject Medi-Cal MCOs that are not Knox-Keene licensed to these standards through their contracts with the State to participate in Medi-Cal, which incorporate the Knox-Keene standards.

103.    In 2015, the California State Auditor determined that Defendant officials failed to monitor MCOs for compliance with those Knox-Keene network adequacy criteria and, to the extent it could be determined, the MCOs failed to comply with the requirements. The State Auditor has stated that Defendants' compliance with this legal requirement is still pending, almost two years later.

104.    DMHC regularly reports that "based on the widespread inaccuracy of the timely access compliance data health plans submitted . . . the DMHC is unable to determine whether health plans met [their] responsibility" to provide "timely access to health care services."

105.    Defendants fail to ensure that the clear standards in the Knox-Keene law and in its contracts are actually met or enforced in reality. For example, the Individual Plaintiffs and others like them have had to wait many months, or even years, for their needed appointments, in violation of Defendants' own timeliness standards.

106.    The State allows the MCOs to participate in Medi-Cal despite the fact that they have too few providers in their networks, with network directories creating the illusion of widespread access to care, when in reality the opposite is true.

107.    Furthermore, Defendants allow "sub-capitation," as referenced above in paragraph 82, under which MCOs provide per-member per-month fees to independent physician associations ("IPAs") and other organizations, and then those IPAs and other organizations in turn may sub-capitate even further to other physician groups and providers. The consequence for sub-capitated patients is that they may be in narrower networks than provider directories reflect, because their physician may be limited to only referring to providers in the patient's sub-capitated network. The incentives are to deny care rather than provide it, because each entity in a sub-

capitated network makes more money if less care is provided, so there is an acute need for regulation and oversight of such narrow networks. The State, however, provides no such oversight and does not determine whether the sub-capitated networks meet the network adequacy requirements established by State law.

## VI. Defendants Also Create Administrative Burdens for Medi-Cal Providers and Participants, Thereby Limiting Access to Care.

108.    Beyond failing to enforce network adequacy standards, Defendants administer Medi-Cal in such a way as to discourage provider participation. Physicians limiting the number of Medi-Cal patients they see cite unnecessary administrative burdens and delays in payment as the most significant reasons, after low reimbursement rates, why they limit the number of Medi-Cal patients in their practices.

109.    Likewise, Defendants have subjected providers to onerous and unpredictable clawbacks when Defendants determine retroactively, long after services have been provided, that patients were not eligible for Medi-Cal or that a service was not authorized or required. Providers are deterred from providing services to Medi-Cal patients as a result, or suffer financially for doing so.

110.    Compared to employer-sponsored insurance, which is by and large subject to Knox-Keene protections, a significant percentage of Medi-Cal participants receive their care from FFS Medi-Cal or MCOs that are not subject to Knox-Keene regulation, resulting in fewer protections for physicians treating patients in FFS Medi-Cal or non-Knox-Keene MCOs. For example, while Knox-Keene plans are prohibited from rescinding or modifying treatment authorization once the treatment has been provided in good faith, no such prohibition applies to non-Knox-Keene Medi-Cal MCOs.

111.    Medi-Cal regularly delays payments to providers relative to other forms of insurance, creating an additional administrative hurdle to provider participation. For example, while Medicare and other forms of insurance implement new CPT codes by January 1 each year, DHCS regularly delays its implementation until September or October, resulting in up to an eight or nine month delay for payment of services corresponding with the new CPT codes.

112. Other administrative barriers to access for providers and participants include the difficulties of obtaining referrals; time limits on referrals that cause them to expire before patients are able to schedule appointments with the limited number of specialists willing to treat Medi-Cal patients; and the existence of sub-capitated networks that complicate and further limit the numbers of specialists willing to treat a given Medi-Cal patient.

## CAUSES OF ACTION

First Cause of Action
Cal. Gov. Code § 11135 *et seq.*
Discrimination – Defeating or Substantially Impairing the Purposes of the Program
By all Plaintiffs against all Defendants

113. Plaintiffs re-allege and incorporate herein by reference the allegations in paragraphs 1 through 112 as though fully set forth here.

114. Government Code section 11135 and its implementing regulations prohibit discrimination in programs or activities funded by the State. Section 11135(a) provides, in pertinent part, that "[n]o person in the State of California shall, on the basis of . . . race, national origin, ethnic group identification . . . [or] color . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

115. As a state-funded program, Medi-Cal is subject to section 11135.

116. Regulations implementing section 11135 provide that it is an unlawful, discriminatory practice "to utilize criteria or methods of administration that . . . have the purpose or effect of [1] subjecting a person to discrimination on the basis of ethnic group identification . . . [or] [2] defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person of a particular ethnic group identification . . . ." 2 Cal. Code Regs. § 11154(i).

117. Key objectives of the Medi-Cal program include implementing the federal Medicaid Act, and thus include ensuring equal access for Medi-Cal participants comparable to the access available to other insured Californians, and making care available with reasonable

29      VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT

1    promptness. *See* 42 U.S.C. § 1396a(a)(30)(A); 42 U.S.C. § 1396a(a)(8).

2        118.    In enacting Medi-Cal, the California Legislature declared the goal of the program

3    was to allow Medi-Cal eligible persons to secure health care in the same manner as the public

4    generally, without discrimination or segregation based purely on their economic disability. Welf.

5    & Inst. Code § 14000(a).

6        119.    Additionally, Knox-Keene standards and contracts with the State require Medi-Cal

7    providers to provide certain ratios of physicians and to meet time, distance, and physician-patient

8    ratio standards, as described above.

9        120.    By failing to provide or ensure adequate reimbursement to Medi-Cal providers,

10   imposing unnecessary administrative complexity and bureaucratic requirements limiting the

11   provision of care, and failing to enforce network adequacy and access requirements, Defendants

12   utilize methods and criteria of administration that defeat or substantially impair the equal access

13   and reasonable promptness objectives of the Medi-Cal program.

14       121.    Defendants' actions and inactions discriminate against Latinos because they are

15   disparately impacted as the majority of Medi-Cal participants and are overrepresented in that

16   program.

17       122.    Pursuant to California Government Code section 11139, Plaintiffs have a private

18   right of action to enforce Section 11135 *et seq.*

19       123.    Defendants' actions and inactions violate the rights of Plaintiffs and the proposed

20   class under Section 11135; wherefore, Plaintiffs are entitled to declaratory and injunctive relief as

21   set forth below.

22                                   Second Cause of Action
                                 Cal. Gov. Code § 11135 *et seq.*
23                               Discrimination – Disinvestment
                              By all Plaintiffs against all Defendants
24
         124.    Plaintiffs re-allege and incorporate herein by reference the allegations in
25
     paragraphs 1 through 123 as though fully set forth here.
26
         125.    It is a discriminatory practice under Section 11135 for a state-funded program to
27
     disinvest from or limit the provision of its benefits as that program's benefits are increasingly
28

extended to members of a protected class.

126.    Defendants have unlawfully discriminated against Medi-Cal participants by disinvesting from Medi-Cal as enrollment of Latinos in Medi-Cal has grown. Paying increasingly lower rates for Medi-Cal coverage as compared to the rates paid for other insured populations has resulted in an unjustified disparate impact on Latinos in the form of significantly reduced access to health care and also constitutes unlawful, intentional discrimination.

127.    Pursuant to California Government Code section 11139, Plaintiffs have a private right of action to enforce Section 11135.

128.    Defendants' actions and inactions violate the rights of Plaintiffs and the proposed class under Section 11135; wherefore, Plaintiffs are entitled to declaratory and injunctive relief as set forth below.

Third Cause of Action
Cal. Const. Art. I, § 7(a) & Art. IV, § 16(a)
California Constitution – Equal Protection
By all Plaintiffs against all Defendants

129.    Plaintiffs re-allege and incorporate herein by reference the allegations in paragraphs 1 through 128 as though fully set forth here.

130.    As set forth above, Defendants fail to ensure equal access to health care.

131.    Latinos are a protected class under the California Constitution. In addition, and in the alternative, access to health care is a fundamental right under the California Constitution, making its denial constitutionally suspect regardless of the demographic makeup of those affected.

132.    The Plaintiff class of Medi-Cal participants has been treated differently than prior Medi-Cal participants as Defendants disinvested and decreased spending as Latino enrollment in the program increased.

133.    Defendants' challenged conduct has an unjustified disparate impact on Latinos, who comprise a majority of Medi-Cal participants.

134.    Defendants violate the rights of Plaintiffs to receive equal protection of the laws, pursuant to Article I, section 7(a) and Article IV, section 16(a) of the California Constitution by

failing to provide them with access to care equivalent to the access to care made available to others elsewhere in the State, including the access provided to Medi-Cal participants when there were fewer Latinos enrolled.

135.    Plaintiffs have given notice of these claims to the State but Defendants provided no relief.

136.    Defendants' unlawful conduct is intentional.

137.    Defendants' unlawful conduct has caused, and unless enjoined by this Court, will continue to cause immediate and irreparable injury to Plaintiffs.

138.    Wherefore, Plaintiffs are entitled to the relief as set forth below.

Fourth Cause of Action
Cal. Const. Art. 1, §7(a)
California Constitution – Substantive Due Process
By all Plaintiffs against all Defendants

139.    Plaintiffs re-allege and incorporate herein by reference the allegations in paragraphs 1 through 138 as though fully set forth here.

140.    Article 1, section 7(a) of the California Constitution guarantees Plaintiffs the right of substantive due process, which prohibits Defendants from infringing on Plaintiffs' constitutionally protected property and liberty interests, or fundamental rights, in a manner that shocks the conscience.

141.    Defendants undertook the duty to provide Plaintiffs with sufficient access to medical care by establishing the Medi-Cal program, holding it out as a sufficient source of health care for indigent Californians who cannot afford alternative health care programs, and providing a justification for employers of indigent workers not to provide employer-sponsored insurance.

142.    Defendants' administration of the Medi-Cal program, including underfunding, failure to adequately monitor network adequacy, and imposition of unreasonable administrative burdens on participants and providers, deprives Plaintiffs and the class of their constitutionally protected property and liberty interests, and fundamental rights, by denying and/or delaying needed medical services, which harms their health.

143.    As government agencies charged with the duty of administering the Medi-Cal

program, Defendants have had ample time and opportunity to consider how their challenged

conduct would likely harm Plaintiffs' and the class's health.

144.    Defendants have acted and continue to act with deliberate indifference and engage

in conscience-shocking behavior because they knew that their administration of the Medi-Cal

program created conditions posing a risk of objectively, sufficiently serious harm to Plaintiffs'

health if they did not receive needed medical treatment, and disregarded that excessive health risk

by denying and delaying Plaintiffs' needed medical care.

### Fifth Cause of Action
Cal. Code Civ. Proc. § 526a
Taxpayer's Action for Injunctive Relief
By all Plaintiffs against all Defendants

145.    Plaintiffs re-allege and incorporate herein by reference the allegations in

paragraphs 1 through 144 as though fully set forth herein.

146.    Plaintiffs are citizens and residents of the United States and of the State of

California who were assessed and have paid taxes to the State of California within one year of the

commencement of this action.

147.    Defendants, by illegally discriminating against Plaintiffs and the class as alleged

herein, have expended and wasted tax monies of the State of California in an illegal manner.

Defendants will continue to expend and waste tax monies as alleged herein in violation of

California law to the irreparable injury of Plaintiffs, requiring a multiplicity of suits, unless

restrained by the issuance of an injunction under California Code of Civil Procedure § 526a.

### Sixth Cause of Action
Code of Civil Procedure § 1085
Writ of Ordinary Mandate
By All Petitioners Against All Respondents

148.    Petitioners reallege and incorporate by reference each and every allegation

contained within paragraphs 1 to 147, inclusive.

149.    Petitioners are beneficially interested parties entitled to a peremptory writ to

"compel the performance of an act which the law specifically enjoins." Code of Civ. Proc.

(C.C.P.) § 1085.

150.    Under the Constitution, the California Government Code and the Medicaid and

Medi-Cal statutes, all Respondents have a legal duty to administer the Medi-Cal program on a non-discriminatory basis, including the duty to refrain from imposing criteria or methods of administration that have the purpose or effect of defeating or substantially impairing the objectives of the Medicaid and Medi-Cal programs on the basis of protected characteristics, including race, color, and ethnic group identification.

151.    Respondents are failing, as set forth herein, to comply with their ministerial legal duties:

a.    under the equal protection clause of the California Constitution, to ensure equivalent access to health care.

b.    under the substantive due process clause of the California Constitution, to not infringe upon Plaintiffs' constitutionally protected liberty and property interests, as well as their fundamental rights, in a manner that shocks the conscience;

c.    under Government Code § 11135, to ensure that Medi-Cal beneficiaries are not unlawfully denied full and equal access to the benefits of the Medi-Cal Program, or unlawfully subjected to discrimination; and

d.    under 2 Cal. Code Regs. § 11154, to refrain from implementing "criteria or methods of administration that . . . have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of . . . [a] program with respect to" Latinos, i.e., persons "of a particular ethnic group identification."

152.    Respondents do not have the legal discretion to administer the Medi-Cal program in a way that violates these ministerial duties.

153.    Petitioners lack a plain, speedy, and adequate remedy at law except by way of peremptory writ of mandate pursuant to C.C.P. § 1085.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment and the following specific relief:

a)      An order and judgment enjoining Defendants from violating Government Code section 11135 and its implementing regulations, as well as the substantive due process and equal protection clauses of the California Constitution, including but not necessarily limited to an order enjoining Defendants to:

> i.      Pay reimbursement rates to doctors and clinicians for treating Medi-Cal beneficiaries that are adequate to ensure health care access comparable to that afforded to the general insured population;
>
> ii.     Ensure that payments to providers in Medi-Cal managed care networks are sufficient to ensure health care access comparable to that afforded to the general insured population;
>
> iii.    Adequately monitor and enforce existing network adequacy and timely access requirements for all Medi-Cal beneficiaries; and
>
> iv.     Remove excessive barriers to access to care for Medi-Cal beneficiaries, including by ensuring timely payment to physicians and other clinicians, facilitating referrals to specialists.

b)      A declaration that Defendants' actions have violated the rights of Plaintiffs to be free from discrimination under Government Code section 11135 and its implementing regulations, and to equal protection and substantive due process under the California Constitution, including but not necessarily limited to a declaration that Defendants must fund and operate the Medi-Cal program to fulfill the objective of providing access to health care for Medi-Cal beneficiaries that is equivalent to the access to health care afforded to the general insured population;

c)      A Writ of Mandate pursuant to California Code of Civil Procedure section 1085 requiring Defendants to comply with Government Code section 11135 and its implementing regulations, as well as with the substantive due process and equal protection clauses of the California Constitution.

d)      Reasonable attorney fees and costs of suit; and

1    e)    Such other and further equitable relief as this Court may deem appropriate and

2  just.

3                                          Respectfully submitted,

4                                          **MEXICAN AMERICAN LEGAL DEFENSE
                                           AND EDUCATIONAL FUND**
5                                          Thomas A. Saenz
                                           Miranda Galindo
6

7                                          **CIVIL RIGHTS EDUCATION AND
                                           ENFORCEMENT CENTER**
8                                          Bill Lann Lee
                                           Tim Fox

9                                          **FEINBERG, JACKSON, WORTHMAN &
                                           WASOW LLP**
10                                         Catha Worthman
                                           Darin Ranahan
11

12                                         **LANG, RICHERT & PATCH**
                                           Ana de Alba

13                                         **THE LAW OFFICES OF NOAH PHILLIPS**
                                           Noah Phillips
14

15

16  Dated: July 12, 2017               By:

17                                         Darin Ranahan
                                           ATTORNEYS FOR PETITIONERS/PLAINTIFFS

18

19

20

21

22

23

24

25

26

27

28

36          VERIFIED PETITION FOR WRIT OF
            MANDATE AND COMPLAINT

1    **VERIFICATION**

2    I, Ana Lilia Jimenez Perez, state that:

3        1.    I am a petitioner in the above-entitled action.

4        2.    I am aware of the nature of the Verified Petition for Writ of Mandate and

5    Complaint for Declaratory and Injunctive Relief being filed on my behalf, the legal bases for the

6    Petition, and the relief being sought.

7        3.    To the extent that the Petition is based upon facts known to me, including the facts

8    stated under my name in the section entitled "Parties," I verify them to be true, and otherwise I

9    am informed and believe that all facts herein are true.

10    I declare under penalty of perjury of the laws of the State of California that the foregoing

11    is true and correct.

12    Executed on July 10, 2017 at Santa Rosa, California.

13

14                                          Petitioner and Plaintiff

15

16    I, Axel Polanco, hereby declare under penalty of perjury that I am proficient

17    in both Spanish and English, and have read the declarant's portion of the Verified Petition for

18    Writ of Mandate and Complaint for Declaratory and Injunctive Relief to the declarant in Spanish.

19    I have also read the foregoing Verification to the declarant in Spanish who has affirmed to me

20    that its contents are both true and correct.

21    Executed on July 10, 2017 at Santa Rosa, California

22

23

24

25

26

27

28

**VERIFICATION**

I, _Saul Jimenez_ state that:

    1.    I am a petitioner in the above-entitled action.

    2.    I have read my portion of the Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief and know the contents thereof.

    3.    To the extent that the Petition is based upon facts known to me, including the facts stated under my name in the section entitled "Parties," I verify them to be true, and otherwise I am informed and believe that all facts herein are true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July _10_, 2017 at _Santa Rosa_ California.

_Saul Jimenez-Davila_
Petitioner and Plaintiff

**VERIFICATION**

I, Esther Castaneda Arellano, state that:

1.      I am a petitioner in the above-entitled action.

2.      I am aware of the nature of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief being filed on my behalf, the legal bases for the Petition, and the relief being sought.

3.      To the extent that the Petition is based upon facts known to me, including the facts stated under my name in the section entitled "Parties," I verify them to be true, and otherwise I am informed and believe that all facts herein are true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July 8, 2017 at Sacramento, California.

_____
Petitioner and Plaintiff

I, Olivia Ruiz, hereby declare under penalty of perjury that I am proficient in both Spanish and English, and have read the declarant's portion of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief to the declarant in Spanish. I have also read the foregoing Verification to the declarant in Spanish who has affirmed to me that its contents are both true and correct.

Executed on July 10, 2017 at Oakland, California

_____

1

**VERIFICATION**

2  I, _Rebecca Binsfeld_, state that:

3      1.      I am a petitioner in the above-entitled action.

4      2.      I have read my portion of the Petition for Writ of Mandate and Complaint for

5  Declaratory and Injunctive Relief and know the contents thereof.

6      3.      To the extent that the Petition is based upon facts known to me, including the facts

7  stated under my name in the section entitled "Parties," I verify them to be true, and otherwise I

8  am informed and believe that all facts herein are true.

9      I declare under penalty of perjury of the laws of the State of California that the foregoing

10  is true and correct.

11  Executed on July _9_, 2017 at _Sacramento_, California.

12

13                                          _Rebecca Binsfeld_
                                            Petitioner and Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VERIFICATION**

I, Ofelia Jardon , state that:

1.    I am a petitioner in the above-entitled action.

2.    I have read my portion of the Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief and know the contents thereof.

3.    To the extent that the Petition is based upon facts known to me, including the facts stated under my name in the section entitled "Parties," I verify them to be true, and otherwise I am informed and believe that all facts herein are true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July 9 , 2017 at Fresno , California.

Petitioner and Plaintiff

**VERIFICATION**

I, David Miller, state that:

1.      I am the Research Director at SEIU-UHW, which includes the SEIU-UHW Community Division, a petitioner in the above-entitled action.

2.      I have read the Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief and know the contents thereof.

3.      To the extent that the Petition is based upon facts known to me, including but not limited to the facts stated under the name of the SEIU-UHW Community Division in the section entitled "Parties," I verify them to be true, and otherwise I am informed and believe that all facts herein are true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July 11ᵗʰ, 2017 at Oakland, California.

David Miller
Research Director
SEIU-UHW
Petitioner and Plaintiff

1

**VERIFICATION**

2

I, Jim Mangia, state that:

3

    1.      I am President and CEO of St. John's Well Child & Family Center ("St. John's"),

4

a petitioner in the above-entitled action.

5

    2.      I have read the Petition for Writ of Mandate and Complaint for Declaratory and

6

Injunctive Relief and know the contents thereof.

7

    3.      To the extent that the Petition is based upon facts known to me, including the facts

8

stated under St. John's name in the section entitled "Parties," I verify them to be true, and

9

otherwise I am informed and believe that all facts herein are true.

10

    I declare under penalty of perjury of the laws of the State of California that the foregoing

11

is true and correct.

12

Executed on July 10, 2017 at Los Angeles, California.

13

14

Jim Mangia

15

President & CEO
St. John's Well Child & Family Center

16

Petitioner and Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

1                                    **VERIFICATION**

2   I, Chris Newman, state that:

3       1.      I am Legal Director of the National Day Laborer Organizing Network

4   ("NDLON"), a petitioner in the above-entitled action.

5       2.      I have read the Petition for Writ of Mandate and Complaint for Declaratory and

6   Injunctive Relief and know the contents thereof.

7       3.      To the extent that the Petition is based upon facts known to me, including the facts

8   stated under NDLON name in the section entitled "Parties," I verify them to be true, and

9   otherwise I am informed and believe that all facts herein are true.

10      I declare under penalty of perjury of the laws of the State of California that the foregoing

11  is true and correct.

12  Executed on July 11, 2017 at Los Angeles, California.

13

14                                          _____

15                                          Chris Newman
                                            Legal Director
16                                          National Day Laborer Organizing Network
                                            Petitioner and Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit B

**SUM-100**

## SUMMONS
### *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ENDORSED
FILED
ALAMEDA COUNTY**

JUL 1 2 2017

CLERK OF THE SUPERIOR COURT

By _____ CURTIYAH GANTER
Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Diana Dooley, as Secretary, California Health and Human Services
Agency; Additional Party Attachment form attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Analilia Jimenez Perea; Saul Jimenez Perea; Esther Castañeda; Rebecca
Binsfeld; Ofelia Jardon; Additional Party Attachment form attached.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY 1225 Fallon Street Oakland, CA 94612 | RG17867262 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Darin Ranahan (SBN 273532), 383 4th Street, Suite 201, Oakland, CA 94607, (510) 269-7998

| DATE: *(Fecha)* | JUL 1 2 2017 | Chad Finke | Clerk, by *(Secretario)* | CURTIYAH GANTER | Deputy *(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* California Department of Health Care Services

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* CCP 416.50 (public entity)

4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | SUMMONS | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| ANALILIA JIMENEZ PEREA, et al. v. DIANA DOOLEY, et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[ ] Plaintiff    [✓] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

Jennifer Kent, as Director, California Department of Health Care Services; California Health and Human Services Agency; California Department of Health Care Services.

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**